UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALRELIO EVANS,

        Plaintiff,

v.

HEIDI WASHINGTON, *et al.*,

        Defendants.

                          /

Case No. 1:19-cv-953

Hon. Paul L. Maloney

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983 by plaintiff Alrelio Evans ("Evans"), a state prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on defendant Chaplain Curtis' motion for summary judgment (ECF No. 65).

    **I.**     **Background**

Evans' complaint involves incidents which occurred at the Michigan Reformatory (RMI) and the E. C. Brooks Correctional Facility (LRF). *See* Opinion (ECF No. 10, PageID.239). The Court dismissed all defendants except for RMI Chaplain Curtis. The Court summarized Evans' claims in pertinent part as follows:

> Plaintiff identifies his religion as Jehovah's Witness. (Program Classification Report, ECF No. 1-2, PageID.37.) That religion is recognized by the MDOC and the department's Religious Groups Handbook notes that adherents are required to study the Bible daily and to attend corporate group study meetings weekly. (Religious Groups Handbook, ECF No. 1-3, PageID.43.)
>
> On May 17, 2019, Plaintiff was housed at RMI. He asked Chaplain Curtis to arrange to have Plaintiff called out for the Jehovah's Witness group service. In

1

Plaintiff's request to Chaplain Curtis, Plaintiff claimed that under the authority of *Kensu v. Cason*, No. 1:91-cv-300, 1996 U.S. Dist. LEXIS 5468 (W.D. Mich. Mar. 29, 1996), he should be permitted to attend a Jehovah's Witness service even if he were the only adherent. (May 17, 2019 Correspondence, ECF No. 1-1, PageID.32.) Plaintiff claimed that unless he was provided access to the chapel for a one-person group service, he would be unable to exercise his religion because of extreme noise and constant distractions in his housing unit.

Despite Plaintiff's citation to authority and claim of an inability to otherwise exercise his religion, Chaplain Curtis denied Plaintiff's request. Chaplain Curtis explained that there were no Jehovah's Witness group services because there was not a sufficient number of adherents asking for such services as required by MDOC policy. MDOC policy provides:

> Group religious services shall be offered at all institutions for prisoners belonging to a recognized religious group. . . . a service is not required to be conducted if there are less than five prisoners within the same security level of that institution who actively participate in the religious activities of a group.

(MDOC Policy Directive 05.03.150, ECF No. 1-7, PageID.161.) Plaintiff was transferred a month later. . . .

Plaintiff notes that he attended Jehovah's Witness services alone at the Gus Harrison Correctional Facility (ARF) in Lenawee County, Michigan. Thus, he contends, the "five prisoner" requirement for group services is not enforced at every prison in Michigan. Plaintiff's interpretation is certainly possible; however, it is also possible that five prisoners requested group services but simply did not attend each service. Plaintiff has also been able to attend Jehovah's Witness group services at RMI during a previous stay when the "five prisoner" rule was satisfied. *Evan et al. v. Prisk et al.*, No. 2:17-cv-46 (W.D. Mich.) (Plaintiff's Reply Br., ECF No. 85, PageID.512.) Nonetheless, Plaintiff claims that Jehovah's Witness adherents are treated differently than Catholic, Protestant, Moorish Science Temple of America, Buddhist, Al Islam, and Nation of Islam adherents, who are permitted to attend group services.

Based on these allegations, Plaintiff asserts that Defendant[] Curtis . . . violated Plaintiff's First Amendment right to free exercise of his religion by denying Plaintiff's request to attend religious services as a Jehovah's Witness. Plaintiff accuses Defendant[] Curtis . . . of violating plaintiff [sic] right to equal protection under the Fourteenth Amendment by not allowing Jehovah's Witness adherents to attend services in the chapel, but allowing other religions to do so. Plaintiff claims . . . Defendant[] violated his rights by conspiring to apply the "five prisoner" requirement to prevent Plaintiff from participating in group services in

> violation of 42 U.S.C. § 1985.  Plaintiff claims . . . Defendant[] violated his rights under the Religious Freedom Restoration Act. . . .
>
> This is not Plaintiff's first lawsuit raising the substance of these allegations— although it is the first time he has raised such allegations against these Defendants.  In *Evans et al. v. Prisk et al.*, No. 2:17-cv-46 (W.D. Mich.) (*Evans I*) [2018 WL 3745736 (July 5, 2018), R&R adopted, 2018 WL 3729533 (Aug. 6, 2018)], Plaintiff sued Marquette Branch Prison (MBP) Chaplain Thomas Prisk and MBP Warden Robert Napel claiming that Prisk and Napel applied the "five prisoner" rule to deny Plaintiff group worship service at MBP.  In *Evans I*, the Court dismissed Plaintiff's challenge to the "five prisoner" rule, as applied to him at MBP, on qualified immunity grounds.

Opinion (ECF No. 10, PageID.239-242).

The only claim remaining claim in this lawsuit is Evans' 42 U.S.C. § 1983 claim that Chaplain Curtis violated his First Amendment rights by applying the MDOC's "five prisoner" rule with respect to group religious services. *See* Report and Recommendation (ECF No. 60); Order (ECF No. 61); Amended Case Management Order (ECF No. 63).

## II.    Defendant's motion for summary judgment

### A.    Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

3

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. First Amendment claim

Evans seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

4

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (internal citations omitted). While prisoners retain First Amendment rights to the free exercise of religion, prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests." *See Flagner v. Wilkinson*, 241 F.3d 475, 481, 483 (6th Cir. 2001) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

As discussed on initial screening, the Court rejected Evans' arguments regarding the application of the "five-person" rule in *Evans I*. As this Court explained in the earlier case:

> To determine whether a prison official's actions are reasonably related to legitimate penological interest, the Court must assess the official's actions by reference to the following factors:
>
> 1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2. are there alternative means of exercising the right that remain open to prison inmates;
>
> 3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of resources generally; and
>
> 4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

> Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90, 107 S.Ct. 2254) ("a regulation cannot be sustained where

5

the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id*.

Applying these factors, the Sixth Circuit has upheld the Constitutionality of rules that require five documented members of a faith before providing group religious services, and has granted prison officials qualified immunity from liability on similar claims.

> This court has consistently permitted prisons to take into account the level of inmate interest in a particular religion when determining whether to hold services. *See, e.g., Spies v. Voinovich*, 173 F.3d 398, 404 (6th Cir. 1999) (concluding that a prison's requirement that a minimum of five inmates of a particular faith must be interested in forming a faith group before the prison will provide for religious services has a "valid, rational connection to legitimate government interests in maintaining security and allocating prison resources"); *Hall v. Tyszkiewicz*, 28 F. App'x 493, 495-96 (6th Cir. 2002) (holding that an inmate was not deprived of his constitutional rights where the prison did not hold Jewish services due to a lack of interest, and where a rabbi visited the inmate once a month); *Bruton v. McGinnis*, 110 F.3d 63, 1997 WL 139797, at *3 (6th Cir. Mar. 26, 1997) (unpublished table decision) ("Scheduling constraints make it clearly unreasonable to provide separate group services for every religious sect that may arise."). In addition, Colvin points to no restrictions on his ability to practice Judaism privately, read Jewish literature, or correspond with other practitioners of the Jewish faith. *See Spies*, 173 F.3d at 404-05 (concluding that an inmate's ability to "meditate privately in the chapel, correspond with fellow believers, and consult individually with a personal minister" demonstrated that he had alternative ways of exercising his religious rights).

*Colvin v. Caruso*, 605 F.3d 282, 291 (6th Cir. 2010). In *Spies*, the Sixth Circuit upheld a similar policy requiring five documented prisoners of a faith before allowing group worship. 175 F.3d at 404-405. In applying the *Turner* factors, the Sixth Circuit concluded that the rule has a rational connection to "maintaining

6

security and allocating prison resources." *Id*. at 404. Spies had alternative means of exercising his religious beliefs such as meditating privately in the chapel and corresponding with fellow believers. *Id*. Accommodation of small prisoner groups strains limited prison resources and prison officials "have an interest in regulating equitably the use of the prison chapel." *Id*. at 405. Finally, Spies failed to point to "ready alternatives available to the regulation in question that fully accommodates his rights at de minimis cost to valid penological interests . . ." *Id*.

In the opinion of the undersigned, the MDOC Policy Directive that allows group services for an approved religion, once five prisoners in the same custody level make a request for service, satisfies Constitutional standards under the *Turner* test as stated in *Colvin* and *Spies*. Defendants are entitled to qualified immunity from liability for relying on the policy directive in denying Plaintiff group services at MBP.

*Evans I*, 2018 WL 3745736 at *3-4.

The question for the Court in Evans' current lawsuit is whether five prisoners at his same custody level at RMI declared a religious preference as Jehovah's Witnesses and requested group services for that religion. In his initial brief, defendant points out that Evans presented no evidence to support his claim that his group met the five-prisoner rule:

Evans has never alleged, and cannot prove, that RMI had the requisite five prisoners designated as Jehovah's Witness to trigger the provision of group religious services under MDOC Policy Directive 05.03.150(V). Evans' correspondence with Chaplain Curtis says "(i)f the 5 prisoner requirement isn't met…". (R. 1-1, PgID. 32.) With his request for a Temporary Restraining Order, Evans provided a declaration stating that he "requested permission to hold Jehovah's Witness services by myself if no other prisoners wished to attend…". (R. 23, PgID. 337.) Even as of his deposition, Evans had nothing more than his claimed belief that there were more than five inmates declared Jehovah's Witness for the purpose of a group service. (Def. Ex. B., Evans Dep. at 51:12-52:19.) Evans makes clear that he "didn't get all of their names…". (*Id*. at 52:3-4.) Despite his claims that additional inmates existed at the time, Evans also acknowledges that he was the only person who requested Jehovah's Witness service. (*Id*. at 51:13-14.) He also acknowledged that he could only meet with other prisoners of the same security level. (*Id*. at 56:5-17.)

State records confirm there were fewer than five Jehovah's Witnesses of Evans' security level requesting group services. The response to Evans' grievance, which is provided by Evans as a complaint exhibit, specifically states that "there

7

>   are currently less than five (5) prisoners requesting a Jehovah's Witness service…".
>   (R. 1-1, PgID 35.)[.]

Defendants' Brief (ECF No. 66, PageID.693-694); Evans' Dep. (ECF No. 66-3, PageID.722-724).

In this response, Evans sets out a number of arguments. First, Evans refers to *Kensu v. Cason* and claims an exception to the five-prisoner rule, stating that "[t]he use of the prison chapel for one additional hour per week would not have caused a strain on institutional resources." Evans' Response (ECF No. 67, PageID.740). Evans does not develop this conclusory argument in a meaningful manner.

Next, Evans contends that *Evans I* "is in Plaintiff's favor since that case ended in settlement." *Id*. at PageID.741. While *Evans I* ultimately settled, the legal conclusions reached with respect to the five-prisoner rule have been adopted by this Court and are persuasive.[1]

Next, Evans contends that defendant "Chaplain Curtis also made the false claim that there were no other prisoners asking for such services when there were at least six others" and that the constitutionality of the five-person rule was not established when the chaplain made that decision in this case in 2019. *Id*. at PageID.740, 743. Evans' contentions are unsupported. As discussed, the reasoning set out in *Evans I* with respect to the five-person rule applies to the present case in which Evans raises the same claim against a different chaplain. In addition, MDOC records establish that only one other prisoner designated his religious preference as Jehovah's Witnesses during the relevant time period. *See infra*.

---

[1] The Court notes that in *Evans I*, the Court granted defendants' motion for summary judgment as to his RLUIPA, First Amendment and conspiracy claims. *Evans I*, 2018 WL 3729533 (Order). The only claim left for trial was an Equal Protection claim, which is not at issue here. *Id*.

Next, Evans submitted an "Unsworn declaration supporting plaintiff's response to defendant's summary judgment motion" (ECF No. 68), stating that a genuine issue of material fact exists. As an initial matter, Evans' Declaration is untimely, having been filed more than one month late.[2] In short, this untimely filing is not part of the record under consideration.

Next, even if the Court were to consider Evans' untimely declaration, this document does not create a genuine issue of material fact in this case. In his declaration, Evans makes the conclusory statement that,

> The other 6 prisoner who requested to attend Jehovah's Witness services were six other prisoners requested to attend Jehovah's Witness services: William Walker 183367; DeMarcus Smith 753545; Dareviuos [Darquis] Dyer 738852; Robert Watts 576440; Vincent Ovalle 975412; and, Johnny Williams 417328.

Evans Decl. (ECF No. 68, PageID.749). A conclusory statement, unsupported by specific facts, is not sufficient at the summary judgment stage of proceedings. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment"). Furthermore, Evans' declaration does not address other facts required for application of the five-prisoner rule, *i.e.*, he does not state that each named prisoner was incarcerated at his custody level at RMI or had declared a religious preference as Jehovah's Witnesses during the relevant time period.

In response to this declaration, defendant filed MDOC records attached to the affidavit of Adrian Dirschell, the MDOC Special Activities Coordinator with the Correctional Facilities Administration. *See* Dirschell Aff. (ECF No. 70-1). These institutional records

---

[2] The Court notes that Evans' response was due on January 3, 2022, and that his responses was docketed on December 28, 2021 (ECF No. 67). While Evans dated his declaration on February 9, 2022, he did not mail it out until February 22, 2022, as evidenced by his certificate of service (ECF No. 69) and the postmarks on both the motion and the certificate of service (ECF Nos. 68 and 69).

9

establish that during the relevant time period, only one of the prisoners listed by Evans designated his religion as Jehovah's Witnesses, *i.e.*, William Henry Walker 183367, who listed a religious preference as Jehovah's Witnesses starting February 11, 2002. Walker arrived at RMI on May 23, 2019, which was during the relevant time period, *i.e.*, after Evans made his request for group services (May 17, 2019) but before Evans transferred out of RMI (July 2, 2019). *See* MDOC Records (Religion History and Offender Movement) (ECF No. 70-1, PageID.769-770); Compl. (ECF No. 1, PageID.11); Evans' Lock History (ECF No. 66-4, PageID.733).

None of the other prisoners designated a religious preference as Jehovah's Witnesses during the relevant time period. The religious preferences of the other identified prisoners were as follows[3]: Johnny Jerome Williams 417328 (Muslim from 10/17/2005 to 5/23/2019 and Seventh Day Adventist starting on 5/23/2019); Vincent Edward Ovalle 975412 (Catholic from 10/11/2018 through 1/14/2020, Buddhism starting on 1/14/2020); Robert Bryant Watts 576440 (Jehovah's Witnesses from 9/27/2005 to 4/25/2007, Nation of Islam from 4/25/2007 to 5/18/2018, Protestant from 5/18/2018 to 2/14/2019, Seventh Day Adventist from 2/14/2019 to 8/3/2019, Nation of Islam starting on 8/3/2019); Darquis Damar Dyer 738852 (unknown from 5/10/2012 to 2/8/2013, Nation of Islam from 2/8/2013 to 7/23/2018, no preference starting on 7/23/2018); Demarcus Johnquez Smith 753545 (Protestant from 12/28/2009 to 3/12/2018, no preference from 3/12/2018 to 4/23/2018, Jehovah's Witness from 4/23/2018 to 3/20/2019, and Protestant starting on 3/20/2019); and, as discussed, William Henry Walker 183367 (Jehovah's Witnesses starting on 2/11/2002). *See* MDOC Records at PageID.764-770.

---

[3] The Court lists the religious designations which appear in the MDOC records.

10

Based on this record, there is no evidence that five prisoners at RMI designated their religion as Jehovah's Witness from the time that Evans made his request for group services at RMI through the date Evans transferred out of RMI. There was neither a violation of the five-prisoner rule nor a violation of the First Amendment. Accordingly, defendant Curtis is entitled to summary judgment.

### C.  Qualified immunity

Finally, defendant Curtis seeks alternative relief by asserting qualified immunity. Under the affirmative defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of qualified-immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil

damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016).  "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*.  When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Based on this record, Chaplain Curtis is entitled to qualified immunity for enforcing the five-prisoner rule at RMI and denying Evans' request for group services.  For the reasons discussed, Curtis did not violate Evans' constitutional rights.  As this Court explained in *Evans I* with respect to Chaplain Prisk's denial of group services at MBP,

> the MDOC Policy Directive that allows group services for an approved religion, once five prisoners in the same custody level make a request for service, satisfies Constitutional standards under the *Turner* test as stated in *Colvin* and *Spies*. Defendants are entitled to qualified immunity from liability for relying on the policy directive in denying Plaintiff group services at MBP.

*Evans I*, 2018 WL 3745736 at *4.

In addition, Chaplain Curtis has filed copies of the MDOC religious preference records for the prisoners identified by Evans.  These records demonstrate that only one of the prisoners identified by Evans (Walker 183367) designated a religious preference as Jehovah's Witnesses while housed at RMI during the relevant time period.[4]  Curtis could rely on those official records to determine whether a particular approved religion at RMI met the five-prisoner rule.  Accordingly, defendant Curtis is entitled to summary judgment on this basis.

---

[4] As discussed, Evans' conclusory declaration is insufficient to establish a factual dispute that will defeat summary judgment.  *See Alexander*, 576 F.3d at 560.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendant Curtis' motion for summary judgment (ECF No. 65) be **GRANTED** and that this action be **TERMINATED**.

Dated: August 22, 2022                              /s/ Ray Kent
                                                    RAY KENT
                                                    United States Magistrate Judge

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).